## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CLARKE, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SECURITY CAPITAL ASSURANCE LTD., PAUL S. GIORDANO, DAVID P. SHEA, XL INSURANCE, LTD., MERRILL LYNCH, PIERCE FENNER & SMITH , INC., GOLDMAN, SACHS & CO., and J.P. MORGAN SECURITIES INC., <br><br> Defendants. | **CIVIL ACTION NO. 08-cv-0158** <br><br> CLASS ACTION COMPLAINT <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, Robert Clarke ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Security Capital Assurance Ltd. ("Security Capital" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### <u>NATURE OF THE ACTION AND OVERVIEW</u>

1.      This is a federal class action on behalf of purchasers of the securities of Security Capital, who purchased or otherwise acquired Security Capital's securities from April 23, 2007 through December 10, 2007 (the "Class Period"), including purchasers who purchased shares in

the Company's Secondary Public Offering of June 6, 2007 (the "SPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Security Capital is a Bermuda-domiciled holding company whose operating subsidiaries provide credit enhancement and protection products to the public finance and structured finance markets throughout the United States and internationally.

3.      On June 6, 2007, the Company conducted a secondary public offering ("SPO"). In connection with its SPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The SPO was a financial success for the Company, as it raised over $300 million by selling over 9.6 million shares of stock to the public at a price of $31.00 per share.

4.      Then on July 23, 2007, Security Capital shocked investors when it reported its second quarter 2007 financial and operational results.  For the quarter, the Company reported net income of $25.9 million, or $0.40 per share, compared to $36.4 million, or $0.79 per share, reported in the second quarter of 2006.  The quarterly decline in net income was principally due to a decline in refunding activity, and a significant increase in losses on derivative instruments. On this news, the Company's shares declined $4.38 per share, or 15.19 percent, to close on July 24, 2007 at $24.26 per share, on unusually heavy trading volume.

5.      Then on October 25, 2007, the Company reported its third quarter 2007 financial and operational results.  For the quarter, the Company reported a net loss of $89.9 million, or $1.40 per share, compared to net income of $28.4 million, or $0.49 per share, reported in the third quarter of 2006.  This quarterly loss was due to a $143 million mark-to-market loss that the Company incurred on financial guarantee obligations executed in credit derivative form.  For the

first nine months of 2007, the Company reported a net loss of $26.7 million, compared to net income of $81.5 million through the first nine months of 2006.  On this news, the Company's shares declined an additional $1.20 per share, or 8.3 percent, to close on October 25, 2007 at $13.25 per share, on heavy trading volume.

6.     Security Capital's shares continued to decline as the Comapny provided investors with additional information concerning its true exposure to collateralized debt obligations ("CDOs") and other residential mortgage-backed securities ("RMBS").

7.     Then on December 11, 2007, *Fortune* published an article suggesting that Security Capital may be facing ratings downgrades.  On this news, the Company's shares declined an additional $1.23 per share, or 15 percent, to close on December 11, 2007 at $6.97 per share, on unusually heavy trading volume.  The following day, Fitch Ratings put Security Capital on ratings watch "negative," which caused the Company's shares to decline an additional $1.52 per share, or 21.8 percent, to close on December 12, 2007 at $5.45 per share.  Finally, on December 13, 2007, the Company issued a press release responding to the Fitch Ratings report in an attempt to reassure investors of its solvency.  On this news, the Company's shares declined an additional $1.22 per share, or 22.4 percent, to close on December 13, 2007 at $4.23 per share, on unusually heavy trading volume.

8.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects.  Specifically, defendants failed to disclose or indicate the following:  (1) that the Company failed to fully disclose the extent of its exposure to CDOs and other RMBS; (2) that the Company failed to adequately reserve for losses as conditions in the housing and credit markets deteriorated; and (3) that the Company improperly valued its credit default swaps.

9.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's principal executive offices are located within this Judicial District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff, Robert Clarke, as set forth in the accompanying certification, incorporated by reference herein, purchased Security Capital's securities at artificially inflated

prices during the Class Period and has been damaged thereby.

15.    Defendant Security Capital is a Bermuda corporation with its principal executive offices located at 26 Reid Street, Hamilton, Bermuda.

16.    Defendant Paul S. Giordano ("Giordano") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and a Director.

17.    Defendant David P. Shea ("Shea") was, at all relevant times, the Company's Chief Financial Officer ("CFO"), Principal Accounting Officer and Executive Vice President.

18.    Defendants Giordano and Shea are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Security Capital's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.    Defendant XL Insurance Ltd. ("XL Insurance") is a wholly-owned subsidiary of XL Capital and sold in excess of 9.6 million shares of Security Capital in the SPO.

20.    Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"),

Goldman, Sachs & Co. ("Goldman Sachs") and J.P. Morgan Securities Inc. (J.P. Morgan) are collectively referred to hereinafter as the "Underwriter Defendants."   The Underwriter Defendants served as financial advisors and assisted in the preparation of Security Capital's SPO.

## SUBSTANTIVE ALLEGATIONS

### Background

21.   Security Capital is a Bermuda-domiciled holding company whose operating subsidiaries provide credit enhancement and protection products to the public finance and structured finance markets throughout the United States and internationally.

### Materially False and Misleading
### Statements Issued During the Class Period

22.   The Class Period begins on April 23, 2007.   On this day, the Company issued a press release entitled "Security Capital Assurance Reports First Quarter 2007 Results."   Therein, the Company, in relevant part, stated:

- **First quarter new business production, or adjusted gross premiums, rose 26% to $138.9 million compared to the 2006 first quarter**

- **First quarter core net premiums earned increased 26% to $45.1 million compared to the 2006 first quarter**

- **First quarter operating income rose 68% to $44.1 million, compared to the 2006 first quarter**

- **Annualized first quarter operating return on equity of 12.6%**

Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today announced earnings for the three-month period ended March 31, 2007. Net income in the first quarter of 2007 was $37.3 million, or $0.58 per share, versus $16.7 million, or $0.36 per share, in the first quarter of 2006. The increase in net income during the first quarter was largely due to a 47% increase in total revenues, which was driven primarily by growth in net premiums earned and investment income.

6

\* \* \*

> "I am pleased with the solid operating results that we posted this quarter as we continue to build upon the momentum that we developed in 2006," said Paul S. Giordano, SCA's president and chief executive officer. "New business production was healthy amid turbulence in certain sectors of the credit market, with opportunities in U.S. structured finance and international business leading the way for us. We are well positioned to take advantage of credit market volatility when it arises, as it did with respect to U.S. sub- prime mortgages this quarter, while maintaining underwriting and pricing discipline."

23.   On June 6, 2007, the Company conducted a secondary public offering ("SPO"). In connection with its SPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The SPO was a financial success for the Company, as it raised over $300 million by selling over 9.6 million shares of stock to the public at a price of $31.00 per share.   Regarding the Company's portfolio, the Registration Statement, in relevant part, stated:

> We have a diversified, high-quality portfolio, comprised of $48.1 billion, $53.8 billion and $16.3 billion of consolidated net par outstanding (principal amount of guaranteed obligations net of amounts ceded to reinsurers) in the public finance, structured finance and international finance, respectively, as of March 31, 2007. Our reinsurance business gives us access to credit exposures that we may not otherwise have the opportunity to obtain through our primary insurance business. As of March 31, 2007, the weighted average credit rating of the obligations that we guaranty was "A+."

24.   With regard to the Company's "competitive strengths," the Registration Statement, in relevant part, stated:

> We believe that our competitive strengths will enable us to capitalize on opportunities in the credit enhancement and protection markets. These strengths include:
>
> **Our Established Triple-A Franchise.** We are one of six financial guarantors with triple-A ratings from Moody's, S&P and Fitch and the only financial guaranty reinsurer with triple-A ratings from

Moody's, S&P and Fitch. In the principal market for financial guaranty insurance, typically there is either a requirement or strong commercial preference for triple-A-rated insurance policies. In the reinsurance market, a triple-A-rated reinsurer provides greater rating agency capital relief to the ceding insurer than a lower-rated reinsurer. Triple-A ratings and market acceptance are difficult and time-consuming to achieve in the financial guaranty industry. We believe that, in addition to our ratings, the market acceptance of our financial guarantees and our established track record in the financial guaranty industry allow us to compete effectively in our existing lines of business and will be advantageous to us as we enter new markets and expand our presence in existing ones.

**Our Focus on Risk-Adjusted Returns.** We have a disciplined approach to underwriting that emphasizes risk-adjusted profitability over market share. Our approach is driven by client service without compromising our credit underwriting process. Our business is organized around integrated teams comprising transactors, credit and quantitative analysts, risk management professionals and attorneys.

**Our Diversified, High Quality Portfolio.** We have a diversified, high-quality portfolio, comprised of $50.3 billion, $55.7 billion and $21.7 billion of consolidated net par outstanding (principal amount of guaranteed obligations net of amounts ceded to reinsurers) in the public finance, structured finance and international finance, respectively, as of March 31, 2007. Our reinsurance business gives us access to credit exposures that we may not otherwise have the opportunity to obtain through our primary insurance business. As of March 31, 2007, the weighted average credit rating of the obligations that we guaranty was "A+."

25.    The statements contained in ¶¶ 22 – 24 were materially false and misleading because defendants failed to disclose or indicate the following: (1) that the Company failed to fully disclose the extent of its exposure to CDOs and other RMBS; (2) that the Company failed to adequately reserve for losses as conditions in the housing and credit markets deteriorated; and (3) that the Company improperly valued its credit default swaps.

## The Truth Begins to Emerge

26.    On July 23, 2007, the Company issued a press release entitled "Security Capital Assurance Ltd. Reports Second Quarter and First Half 2007 Results." Therein, the Company, in

relevant part, stated:

> Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today announced earnings for the three- and six-month periods ended June 30, 2007. ***Net income available to common shareholders in the second quarter of 2007 was $25.9 million or $0.40 per share compared to $36.4 million or $0.79 per share in the second quarter of 2006. The decline in net income per share during the quarter was principally due to a decline in refunding activity, an increase in unrealized losses on derivative financial instruments*** caused by widening credit spreads and the impact of additional shares issued during the Company's initial public offering ("IPO") in August 2006. For the first six months of 2007, net income rose 19% to $63.2 million compared to $53.1 million in the prior year period. [Emphasis added.]

27.    Upon the release of this news, the Company's shares declined $4.38 per share, or 15.19 percent, to close on July 24, 2007 at $24.46 per share, on unusually heavy trading volume.

28.    On October 16, 2007, the Company issued a press release entitled "Security Capital Assurance Ltd. Announces Third Quarter 2007 Unrealized Mark-to-Market Loss on its Credit Derivatives Portfolio."  Therein, the Company, in relevant part, stated:

> Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today announced that its ***results for the third quarter 2007 will be affected by an unrealized, pre-tax, mark-to-market loss of approximately $145 million with respect to its credit derivatives portfolio. As a result, the Company expects to report a net loss for the third quarter under U.S. Generally Accepted Accounting Principles ("GAAP").*** The mark-to-market loss associated with the credit derivatives portfolio, however, will not impact SCA's operating income (1), the non-GAAP measure of income used by equity research analysts to assess the Company's performance. The Company also announced that it will report adjusted gross premiums ("AGP") (2), a measure of new business production, for the third quarter of approximately $140 million versus $91 million in the third quarter of 2006. No case reserves for credit losses were established by the Company during the third quarter of 2007.   [Emphasis added.]

29.    Then on October 25, 2007, the Company issued a press release entitled "Security Capital Assurance Reports Results for the Third Quarter and First Nine Months of 2007."

Therein, the Company, in relevant part, stated:

> Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today announced earnings for the third quarter and first nine months of 2007. ***The net loss to common shareholders under generally accepted accounting principles ("GAAP") for the third quarter of 2007 was $89.9 million or $1.40 per share compared to net income of $28.4 million or $0.49 per share for the third quarter of 2006. As previously announced by the Company, the net loss per share during the quarter was due to a $143.0 million pre-tax ($131.7 million after-tax, or $2.05 per share), unrealized mark-to-market loss on financial guarantee obligations executed in credit derivative form.*** Operating income, the non-GAAP measure of income used by equity research analysts to assess the Company's performance, excludes this unrealized mark-to-market loss. ***For the first nine months of 2007, the GAAP net loss to common shareholders was $26.7 million compared to GAAP net income of $81.5 million in the prior-year period.*** [Emphasis added.]

30.     Upon the release of this news, the Company's shares declined an additional $1.20 per share, or 8.3 percent, to close on October 25, 2007 at $13.25 per share, on heavy trading volume.

31.     On November 1, 2007, Security Capital issued a press release entitled "Significant Mark-To-Market Losses On Credit Derivatives Not Expected To Affect Bond Insurer Ratings." Therein, the Company, in relevant part, stated:

> With many bond insurers reporting significant mark-to-market losses on credit derivatives in their third-quarter 2007 GAAP earnings reports, accounting issues have once again come to the forefront in shaping investors' perceptions of insurers. Standard & Poor's Ratings Services has previously commented on this topic, explaining that we do not view mark-to-market losses or gains on credit derivatives as having a fundamental economic effect (in that they are not predictive of future claims) for the purposes of our capital adequacy and profitability analyses. As a result, this volatility--to the extent that it is not reflective of credit deterioration in the underlying issues--will not likely precipitate any rating or outlook changes. Nevertheless, ***in light of the significant decline in earnings that some companies experienced this quarter, we believe it is appropriate to reaffirm our position on this topic. Mark-to-market accounting can have a meaningful***

*effect on two elements of our analysis. First, if a company's ability to generate new business is impaired because potential customers grow concerned over significant reported negative marks, they may question the company's vibrancy and vitality, and ultimately, its viability. Secondly, lower GAAP net worth, driven by significant negative marks, may trigger covenant violations in debt instruments, leading to the possibility that the company may be required to pay off certain borrowings or lose access to bank lines that support liquidity.* [Emphasis added.]

32.     Upon the release of this news, the Company's shares declined an additional $3.00 per share, or 22.87 percent, to close on November 1, 2007 at $10.12 per share, on heavy trading volume.

33.     On November 13, 2007, the Company issued a press release entitled "Security Capital Assurance Comments on Fitch Ratings Actions."  Therein, the Company, in relevant part, stated:

> Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") provided an update today regarding Derivative Fitch's ("Fitch") recent announcement of ratings downgrades and affirmations for global structured finance collateralized debt obligations ("SF CDOs").
>
> *Among the 352 Fitch ratings actions announced yesterday, two transactions insured by the Company, which represent $792 million in net par insured or approximately 0.5% of SCA total net par outstanding, were downgraded. One SCA insured transaction of approximately $371 million net par, originally rated AAA by Fitch on June 1, 2007, was downgraded to CCC. The other transaction of approximately $421 million net par, originally rated AAA by Fitch on March 29, 2007, was downgraded to BBB. SCA's portfolio contains only one other SF CDO rated by Fitch. This transaction of approximately $573 million net par, originally rated AAA by Fitch on June 27, 2006, remains under review.* The agency announced its intention to complete its review by November 21, 2007. The downgrades by Fitch do not trigger any present obligation on the part of SCA to pay claims on these transactions.
>
> On November 5, 2007, Fitch issued a press release indicating that it was updating its capital adequacy analysis for the financial guarantee industry in light of recent rating actions by the rating

agencies with respect to SF CDOs with exposure to subprime mortgage-backed securities. ***Fitch's preliminary observation is that there is a "moderate probability" that SCA may experience pressure in its capital cushion under Fitch's updated stress analysis due to relatively high SF CDO exposures relative to SCA's most recently measured capital cushion. The results of Fitch's review are expected in mid-December 2007.*** [Emphasis added.]

34.     Upon the release of this news, the Company's shares declined an additional $1.01 per share, or 13.7 percent, to close on November 15, 2007 at $5.96 per share, on unusually heavy trading volume.

35.     Then on December 11, 2007, *Fortune* published an article entitled, "Is $1 Billion Enough for MBIA?"  There article in relevant part, stated:

> MBIA (MBI) and the other mortgage insurers are giving back a bit of Monday's red hot capital-infusion rally. The declines came after Monday afternoon's sobering news from Washington Mutual (WM), which sharply raised its loss expectations for the next two quarters amid the meltdown of the U.S. housing market. ***Raising $1 billion through stock sales should allow MBIA to retain its triple-A credit rating, and the deal suggests that rivals Ambac (ABK) and Security Capital (SCA) will be able to scrape up some funds in coming weeks to head off any possible downgrades of their own.*** [Emphasis added.]

36.     Upon the release of this news, the Company's shares declined $1.23 per share, or 15 percent, to close on December 11, 2007 at $6.97 per share, on heavy trading volume.

37.     On December 12, 2007, Fitch Ratings put Security Capital on "Ratings Watch Negative," which means that the Company was at risk of losing its "AAA Rating" due to the fact that many of its insured securities were affected by the subprime mortgage meltdown.

38.     Later on December 12, 2007, Security Capital issued a press release responding to the Fitch Ratings report.  Therein, the Company, in relevant part, stated:

> Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") responded today to Fitch Ratings' ("Fitch") announcement of the completion of its Insurer Financial Strength

("IFS") ratings review for XL Capital Assurance Inc. ("XLCA") and XL Financial Assurance Ltd ("XLFA"), SCA's financial guarantee insurance and reinsurance subsidiaries, respectively. ***Following the completion of Fitch's review, the AAA ratings of both XLCA and XLFA have been placed on Rating Watch Negative pending further action to be taken by both subsidiaries to increase their capital base as required under Fitch's ratings guidelines within the next four to six weeks.*** [Emphasis added.]

39.     Upon the release of this news, the Company's shares declined an additional $1.52 per share, or 21.8 percent, to close on December 12, 2007 at $5.45 per share, on unusually heavy trading volume.

40.     Finally, on December 13, 2007, Security Capital issued a press release with additional commentary on the Fitch Ratings.  Therein, the Company, in relevant part, stated:

Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today elaborated on its response to the Fitch Ratings ("Fitch") action announced yesterday.

***As previously stated, SCA has a plan involving a range of options to address the capital adequacy shortfall under Fitch's Matrix financial guarantee capital model*** as described in Fitch's press release on December 12, 2007. ***Components of the plan include, but are not limited to, the following possible actions: the use of existing and new reinsurance arrangements; the restructuring of certain insured obligations with SCA's counterparties; and the raising of additional debt or equity capital from external sources. Fitch stated in their press release yesterday that the Company's capital shortfall is at least $2 billion.*** There can be no assurance as to the relative amounts of capital to be raised or generated through the various components of the plan or that SCA's plan will successfully address Fitch's capital requirements within the required four- to six-week timeframe. [Emphasis added.]

41.     Upon the release of this news, the Company's shares declined an additional $1.22 per share, or 22.4 percent, to close at $4.23 per share, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Security Capital's securities between April 23, 2007 and December 10, 2007 (the "Class Period"), including purchasers who purchased shares in the Company's June 6, 2007 Secondary Public Offering (the "SPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and Securities Exchange Act of 1934 (the "Exchange Act").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Security Capital's securities was actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Security Capital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Security Capital; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

48.     The market for Security Capital's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Security Capital's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Security Capital's securities relying upon the integrity of the market price of Security Capital's securities and market information relating to Security Capital, and have been damaged thereby.

49.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Security Capital's securities, by publicly issuing false and

misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

50.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Security Capital's financial well-being and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Security Capital and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## **LOSS CAUSATION**

51.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

52.     During the Class Period, Plaintiff and the Class purchased securities of Security Capital at artificially inflated prices and were damaged thereby.  The price of Security Capital's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

53.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Security Capital, their control over, and/or receipt and/or modification of Security Capital's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Security Capital, participated in the fraudulent scheme alleged herein.

54.     During the Class Period, and with the Company's shares trading at artificial inflated levels, the Company successfully completed a secondary public offering on June 6, 2007.  The SPO was a financial success for the Company and certain selling shareholders, as they raised over $300 million by selling 9.68 million shares to investors at a price of $31.00 per share.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

55.     At all relevant times, the market for Security Capital's securities was an efficient market for the following reasons, among others:

> (a)     Security Capital's securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Security Capital filed periodic public reports with the SEC and the NYSE;

(c)   Security Capital regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Security Capital was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

56.   As a result of the foregoing, the market for Security Capital's securities promptly digested current information regarding Security Capital from all publicly-available sources and reflected such information in the price of Security Capital's securities. Under these circumstances, all purchasers of Security Capital's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

57.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Security Capital who knew that those statements were false when made.

**FIRST CLAIM**
**Violation of Section 11 of**
**The Securities Act Against All Defendants**

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

59.     This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's securities pursuant or traceable to the false Registration Statement issued in connection with the SPO.

60.     Individual Defendants as signatories of the Registration Statement, as directors and/or officers of Security Capital and controlling persons of the issuer, owed to the holders of the securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they

became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, defendants are liable to the Class.

61.     Underwriter Defendants owed to the holders of the securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, defendants are liable to the Class.

62.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

63.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

64.     As a direct and proximate result of defendants' acts and omissions in violation of

the Securities Act, the market price of Security Capital's securities sold in the SPO was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their ownership of Security Capital's securities pursuant to the Registration Statement.

65.     Security Capital is the issuer of the securities sold <u>via</u> the Registration Statement. As issuer of the securities, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

66.     At the times they obtained their shares of Security Capital, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

67.     This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

68.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

**<u>SECOND CLAIM</u>**
**Violation of Section 12(a)(2) of**
**<u>The Securities Act Against All Defendants</u>**

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

71.     Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Security Capital Offering Registration Statement.

72.     The Security Capital SPO Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.   The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Registration Statement.

73.     Defendants owed to the purchasers of Security Capital's securities, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the SPO materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the SPO materials as set forth above.

74.     Plaintiff and other members of the Class purchased or otherwise acquired Security Capital's securities pursuant to and/or traceable to the defective Registration Statement.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

75.     Plaintiff, individually and representatively, hereby offer to tender to defendants that securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for that securities together with interest thereon.  Class members who have sold their Security Capital securities are entitled to rescissory damages.

76.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff

and members of the Class who hold Security Capital securities purchased in the SPO have the right to rescind and recover the consideration paid for their Security Capital securities, and hereby elect to rescind and tender their Security Capital securities to the defendants sued herein. Plaintiff and Class members who have sold their Security Capital securities are entitled to rescissory damages.

77.     This action is brought within three years from the time that the securities upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
**Violation of Section 15 of The Securities Act**
**Against the Individual Defendants**

78.     Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

79.     This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

80.     Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Security Capital within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Security Capital to engage in the acts described herein.

81.     Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

82.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**FOURTH CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Security Capital securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

85.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Security Capital's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

86.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Security Capital's

financial well-being, business relationships, and prospects, as specified herein.

87.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Security Capital's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Security Capital and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Security Capital securities during the Class Period.

88.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

89.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Security Capital's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

90.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Security Capital securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Security Capital's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Security Capital securities during the Class Period at artificially high prices and were damaged thereby.

91.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that

Security Capital was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Security Capital securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

92.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## FIFTH CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

94.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.     The Individual Defendants acted as controlling persons of Security Capital within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

97.     As set forth above, Security Capital and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: January 8, 2008

**BRODSKY & SMITH, LLC**

By: *s/ Evan J. Smith, Esquire*
Evan J. Smith, Esquire
240 Mineola Blvd
Mineola, NY 11501
516-741-4977
516-741-0626 (fax)

**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Richard A. Maniskas
D. Seamus Kaskela
David M. Promisloff
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

**Attorneys for Plaintiff**